PIONEER BANK AND TRUST COMPANY, Plaintiff-Appellee, v. SEIKO SPORTING GOODS, U.S.A. COMPANY, *et al.*, Defendants (Continental Illinois National Bank and Trust Company of Chicago, Defendant-Appellant).

First District (1st Division) No. 1—88—1625

Opinion filed May 15, 1989.—Rehearing denied July 17, 1989.

Richard H. Ferri, of Chicago, for appellant.

Herbert Beigel and Leigh R. Lasky, both of Beigel & Sandler, of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Continental Illinois National Bank and Trust Company of Chicago, appeals from a judgment entered by the circuit court of Cook County against Continental and in favor of plaintiff, Pioneer Bank and Trust Company, as a result of the court's finding that Continental had improperly made payments under a letter of credit and had wrongfully charged Pioneer's account for the amount of those payments. On appeal, Continental contends that: (1) Pioneer waived its right to object to Continental's payment of the drafts; (2) Pioneer failed to mitigate its damages; (3) Pioneer's damages were not caused

by Continental; and (4) Continental met its burden of proof to establish that Pioneer had authorized payment of the drafts presented under the letter of credit. For the following reasons, we affirm the judgment of the circuit court.

The record sets forth the following facts relevant to this appeal. In March 1982, Seiko Sporting Goods, U.S.A. Company, an importer and distributor of sporting goods, requested a commercial letter of credit from Pioneer to guarantee payment of its purchase of tennis rackets from Li Mao Sports Company, Inc., located in Taiwan. Because Pioneer did not issue international letters of credit on its own, but only as a correspondent bank, Pioneer contacted Continental. As a result, Pioneer and Seiko, as coapplicants, applied for an irrevocable letter of credit from Continental and Pioneer opened an account at Continental on behalf of Seiko from which the drafts on the letter of credit would be paid. Seiko, in turn, signed a note with Pioneer to secure the account Pioneer had opened at Continental on Seiko's behalf.

On March 30, 1982, Continental issued its irrevocable letter of credit with an expiration date of April 27, 1982. The expiration date was subsequently amended twice in writing to May 8, 1982, and then to June 10, 1982. The letter of credit contained, *inter alia*, the following terms:

(1) The goods were to be shipped to Chicago via Sealand Inland America Vessel Mariner-18 leaving on April 23, 1982;

(2) the goods were to be shipped FOB vessel from Keelung, Taiwan;

(3) the first negotiating bank was to send one original of each document directly by airmail to: C. Skierkiewicz, 3113 N. Central, Chicago, Illinois 60634.

On June 18, 1982, Chris Stoller, one of the owners of Seiko, telephoned Continental and informed Gary Muller, a letter of credit negotiator, that there were some documents coming in which contained discrepancies and Continental was not to pay them until it heard further from Seiko. At that time, Muller informed Stoller that because Pioneer, not Seiko, was Continental's customer, authorization as to payment of any drafts with discrepancies would have to be given by Pioneer. As a result of this conversation, Muller called Mike Meyer of Pioneer a few days later and told him that the first set of documents had arrived and there were discrepancies on them. One of the drafts was timely presented, but contained a discrepancy as to the name of the shipping vessel. The other two drafts were not presented until after the letter of credit's expiration date of June 10, 1982. Timeliness of presentment was determined by the date on which documents were

delivered to the first negotiating bank in Taiwan.

Muller also told Meyer about his conversation with Chris Stoller. Meyer then told Muller that he would contact Stoller to find out how the matter was to be resolved and to temporarily keep the documents on hold. Several days later, Muller called Meyer again to find out how things were going. Meyer told him that the matter had not been resolved and it should be kept on hold. When Muller left for vacation on June 25, he still had not heard from Meyer. Muller left the file for Matt Quebbeman with a note stating that the matter was to remain on hold until Pioneer contacted them.

Subsequently, on either June 28 or June 30,[1] Quebbeman called Terry Blaida, vice-president of commercial lending at Pioneer, and asked what Pioneer wanted Continental to do with the documents. Blaida told Quebbeman that he was in contact with Seiko and would get back to him. Quebbeman testified that when he called Blaida again to ask him about the discrepancies, Blaida told him that he did not foresee any problems paying the drafts and that he would get back to him later that day. Blaida did not tell Quebbeman to pay the drafts, nor did he tell him not to pay them. When Quebbeman did not hear anything further from Blaida, Quebbeman put the drafts through for payment on June 30. On cross-examination, Quebbeman stated that even though the original bills of lading were shipped directly to Seiko, if the documents received by Continental did not conform to the letter of credit terms, pursuant to standard policy, Continental was not to pay the drafts unless Pioneer waived the discrepancies. The trust receipts used by Continental provided for waiver of discrepancies on letter of credit documents by signature of the customer. Pioneer never signed the receipts.

On July 1, when Blaida called Quebbeman and inquired as to the status of the discrepancies, Quebbeman told him that he had processed the drafts the day before. As a result, Continental had debited Pioneer's account for the amount of the payments on the drafts and had sent all documents to Pioneer.

Seiko never paid Pioneer on its note, and on April 21, 1983, Pioneer filed its cause of action against Seiko (counts I and II); Leo Stoller, guarantor of Seiko's note (counts III and IV); and Continental (count V). Following a bench trial, the circuit court entered judgment as to count V in favor of Pioneer and against Continental. Thereafter, the circuit court denied Continental's post-trial motion. Continental's

---

[1]Continental claims that the call was made on June 28; Pioneer claims that it was made on June 30.

timely appeal followed.

Initially, Continental contends that Pioneer waived its right to object to Continental's payment of the drafts because: (1) Pioneer allowed Seiko to accept the goods, and (2) Pioneer allowed documents of title to be consigned to Seiko. With respect to Seiko's alleged acceptance of the goods, Continental argues that Pioneer is accountable for Seiko's actions and that Seiko knew as early as June 18 that there were discrepancies in the documents, yet still picked up the goods. Continental offers no legal authority to support its theory of accountability. Further, Continental claims that at no time prior to June 30 did Pioneer ever advise Continental not to pay the drafts.

 Section 5—103(1)(a) of the Uniform Commercial Code (the Code) (Ill. Rev. Stat. 1985, ch. 26, par. 5—103(1)(a)) defines a letter of credit as "an engagement by a bank or other person made at the request of a customer *** that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." Generally, three separate agreements are involved in a letter of credit transaction: the contract between the issuer and its customer whereby the issuer agrees to issue the letter of credit to the beneficiary of the letter of credit; the contract between the customer and the beneficiary, which is the agreement underlying the letter of credit; and the letter of credit itself, whereby the bank agrees to pay the beneficiary the amount of the letter of credit, if the beneficiary complies with the terms of the letter of credit. (*Mount Prospect State Bank v. Marine Midland Bank* (1983), 121 Ill. App. 3d 295, 459 N.E.2d 979.) The letter of credit is independent of the underlying contract, and the obligations under the letter of credit have no relationship to compliance of the buyer or seller with the underlying contract. The issuer deals only with the documents, which must comply with the terms of the letter of credit. (*Pastor v. National Republic Bank* (1979), 76 Ill. 2d 139, 390 N.E.2d 894.) When the documents presented comply with the conditions specified in the letter of credit, the issuer is authorized and obligated to pay. Conversely, when the documents do not comply, the issuer is not authorized to pay until discrepancies are waived by its customer. (See *Pastor v. National Republic Bank*, 76 Ill. 2d 139, 390 N.E.2d 894.) Essentially, the issuer's function regarding a letter of credit is ministerial. *Mount Prospect State Bank v. Marine Midland Bank*, 121 Ill. App. 3d 295, 459 N.E.2d 979.

 Application of the general rules regarding a letter of credit transaction to the present case indicates that Seiko's actions with respect to the goods themselves and with respect to the documents of title are independent of any obligation Continental has with respect to

the letter of credit. If the documents seeking payment did not comply with the terms of the letter of credit, then Continental was not authorized to issue payments unless Pioneer waived the discrepancies. There is no indication in the record that Pioneer ever waived the discrepancies, either orally or in writing.

In addition, Continental's statement that Pioneer never told it not to pay the drafts is equally unpersuasive. Matthew Quebbeman of Continental stated that if the documents received by Continental did not conform to the terms of the letter of credit, it was standard policy that Continental was not to pay unless the discrepancies were waived. Thus, even if Pioneer had not expressly told Continental not to pay the drafts, pursuant to Continental's own policy, if discrepancies had not been waived, Continental had no authority to pay the drafts.

■ Further, although Continental has properly relied on *North Valley Bank v. National Bank* (N.D. Ill. 1977), 437 F. Supp. 70, *Northern Trust Co. v. Oxford Speaker Co.* (1982), 109 Ill. App. 3d 433, 440 N.E.2d 968, and *Continental National Bank v. National City Bank* (9th Cir. 1934), 69 F.2d 312, for its contention that waiver/estoppel arguments are appropriate regarding letter of credit transactions, these cases do not support application of the waiver defense in the present case. First, the courts in *North Valley Bank* and *Northern Trust Co.* merely addressed the propriety of the defense regarding a letter of credit transaction and remanded the causes for consideration of the defense. As an additional point of distinction, in *Northern Trust Co.*, Oxford Speaker Co. claimed that but for Northern's assurances and expertise regarding compliance with the letter of credit requirements, it would never have entered into the sales transactions. This situation of detrimental reliance is not present in the case at bar. Finally, in *Continental National Bank*, the court recognized the application of waiver, but based its decision on other grounds. In fact, *Continental National Bank* supports the general rule that an issuing bank's sole concern, unless otherwise specified in the letter of credit, is whether the draft conforms to the terms of the letter of credit, and this concern is independent of any claims made regarding the goods.

■ We also find Continental's second ground for waiver unpersuasive, *i.e.*, that Pioneer allowed documents of title to be consigned to Seiko. This argument fails for three reasons. First, as previously discussed, the letter of credit is independent of the underlying sale of goods or the passing of title. Second, Continental drafted the letter of credit with full knowledge of the provision that original bills of lading were to be sent to Seiko. Continental cannot now claim waiver based

on instructions to which it knowingly acquiesced. (See *Hansen v. Board of Education* (1986), 150 Ill. App. 3d 979, 502 N.E.2d 467.) Third, at trial, Matthew Quebbeman, letter of credit negotiator for Continental, testified that even if original bills of lading were shipped directly to the buyer, if the documents received by Continental did not conform to the letter of credit terms, it was Continental's policy not to pay unless the discrepancies were waived.

Finally, in its reply brief, Continental argues that under the principal/agent theory, Pioneer became bound by Seiko's acceptance of the goods. Once again, Continental offers no legal authority to support this attenuated argument, and, accordingly, we decline to address it. See *Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.

Next, Continental contends that Pioneer failed to mitigate damages incurred by Seiko's failure to pay the note due and owing Pioneer as security for the letter of credit. However, Continental neglects to explain what effect this alleged failure has on Pioneer's right to a judgment against Continental. Based on the prayer for relief, we assume that Continental believes that Pioneer's failure to mitigate is grounds for reversal of the entire judgment.

Specifically, Continental claims that because Pioneer knew that the drafts had been paid and that the goods, in which Pioneer had a security interest, were in Seiko's possession, Pioneer should have made some reasonable effort to secure or to protect the goods. Continental further argues that Pioneer's failure to take any action constitutes a failure to mitigate damages.

■■ ■ Preliminarily, although the duty to mitigate damages has been recognized by some courts (*Wichita Eagle & Beacon Publishing Co. v. Pacific National Bank* (N.D. Cal. 1971), 343 F. Supp. 332, *rev'd on other grounds* (9th Cir. 1974), 493 F.2d 1285; *Maurice O'Meara Co. v. National Park Bank* (1925), 239 N.Y. 386, 146 N.E. 636), the Code does not explicitly set forth this duty. Damages which may invoke the "duty to mitigate" have been defined as " 'damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation [and] are either not caused by the defendant's wrong or need not have been ***.' " (*Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank* (3d Cir. 1979), 611 F.2d 465, 471, quoting 11 Williston on Contracts §1353, at 274 (3d ed. 1968).) The burden of proof that the injured party has failed to mitigate damages is on the party who has breached the contract. (*Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank* (3d Cir. 1979), 611 F.2d 465.) However, the duty to mitigate may not be invoked by

one who has breached a contract as grounds for a hypercritical examination of the injured party's conduct, or as evidence that the injured party might have taken steps which seemed wiser or would have been more advantageous to the breaching party. *In re Kellett Aircraft Corp.* (3d Cir. 1950), 186 F.2d 197.

■ In the present case, Continental claims that Pioneer failed to show that it had done anything to mitigate its damages. However, it is Continental's burden to prove this affirmative defense, not Pioneer's, and the record is void of any evidence that Continental has met this burden. In fact, the record refutes Continental's allegation. For example, Pioneer's complaint is evidence on its face that it took action against Seiko and Stoller, as guarantor of the note, to recover the amount wrongfully paid by Continental. Further, the complaint alleges that Pioneer had made repeated demands on Seiko and Stoller for payment. Moreover, because the damages caused to Pioneer were solely the result of Continental's breach of its obligation not to pay drafts drawn on the letter of credit if there were discrepancies in the documents, Pioneer is under no duty to mitigate. (*Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank* (3d Cir. 1979), 611 F.2d 465.) Although it would have been more advantageous to Continental if Pioneer had taken possession of the goods from Seiko and sold them to mitigate its losses, Pioneer had no legal obligation to incur the time or the expense of collecting the goods and arranging for their sale. *Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank* (3d Cir. 1979), 611 F.2d 465.

■ Next, Continental claims that it did not cause Pioneer's damages. Continental predicates this argument on section 2—319(4) of the Code, which it claims requires the buyer to make payment for goods shipped FOB vessel when the required documents are tendered to the buyer. Continental asserts that because the original bills of lading were sent directly to Seiko's agent, Seiko had an obligation to pay. Thus, Continental's payment of the drafts drawn on the letter of credit could not have resulted in any harm to Seiko or Pioneer.

Once again, Continental offers no legal authority to support its interpretation of section 2—319(4). In fact, Continental omits crucial language of that section which adds the caveat, "unless otherwise agreed." In the present case, payment was not made directly by the buyer to the seller. Instead, payment was to be made pursuant to a letter of credit. Thus, the buyer and seller had "otherwise agreed" to the method of payment, and the provisions of section 2—319(4) are inapplicable. By virtue of the letter of credit, Continental's obligations were independent of the buyer's and seller's mutual obligations.

(*Mount Prospect State Bank v. Marine Midland Bank* (1983), 121 Ill. App. 3d 295, 459 N.E.2d 979.) Continental was obligated to pay only if the drafts conformed to the letter of credit or if any discrepancies in the draft were waived by Pioneer. Neither situation for payment occurred in the present case. Accordingly, we find that Continental wrongfully paid and charged the payment against Pioneer's account, which action clearly resulted in damages to Pioneer.

▬ Next, Continental asserts that it had established that Pioneer had authorized payment of the drafts presented under the letter of credit. Continental predicates this assertion on the testimony of Terry Blaida, vice-president of commercial lending at Pioneer, and claims that Blaida's statement to Continental's Matthew Quebbeman that if there were any problems, Blaida would get back to him that day, coupled with Blaida's failure to call back, "raises the presumption that Pioneer authorized payment." Further, "[b]ecause the presumption is unrebutted, Continental is entitled to prevail." Once again, Continental offers no legal authority to support this theory.

Further, even if Continental had a viable legal theory, the facts do not support its conclusion. At best, it is unclear exactly what Blaida said to Quebbeman. In its brief, Continental chose excerpts from Blaida's testimony during cross examination and during redirect, but neglected to include the following testimony given during direct:

"[Blaida]: Later in the day, Mr. Quebbeman called me from Continental.

[Counsel]: Do you recall when that conversation took place?

[Blaida]: It was later in the afternoon. And at that time, I conveyed to Mr. Quebbeman my conversations with Leo Stoller, in which, again, Leo Stoller said he wasn't aware of any reason why it should not be paid out but that we should wait for a final decision until he heard from his brother, Chris Stoller.

[Counsel]: And what did Mr. Quebbeman say?

[Blaida]: Mr. Quebbeman responded that they needed to make a decision that working day, if possible, and to which I responded, 'All we can go on is by the facts we have now, and the facts are that they are not authorizing payment of the letter of credit and I will attempt to contact them again and see if we have a decision.'

[Counsel]: Did you, in fact, try to contact Seiko again that day?

[Blaida]: Yes, I did.

[Counsel]: And did you speak to somebody?

[Blaida]: I spoke to Leo Stoller again.

[Counsel]: And what did Mr. Stoller have to say, if anything?

[Blaida]: He said that he had not been able to contact his brother Chris yet, but that he would continue trying to do so and that there was no change in decision from our previous conversation.

[Counsel]: Did you then call Continental back?

[Blaida]: No, I didn't."

Further, the record indicates that the procedure for waiving discrepancies in letter of credit transactions is to have the authorizing party sign the waiver portion on the trust receipts prepared by Continental. In the present case, this was never done even though all prior amendments to the letter of credit had been made in writing. Based on evidence in the record, we find that Continental had failed to establish that a verbal authorization, even if unequivocal, would have been sufficient under the terms of the letter of credit.

■■ Finally, Continental argues that it had proved by a preponderance of the evidence that it had acted in good faith in honoring the drafts. Therefore, pursuant to paragraph 8 of the letter of credit agreement, which states that any actions taken by Continental in good faith are binding on Pioneer, Continental claims that it is not liable. Without supporting legal authority, Continental contends that the fact it had called Pioneer to obtain instructions is sufficient evidence of its good faith.

We find this argument to be without merit. Even assuming that Blaida's conversation with Quebbeman was exactly as Continental would like this court to believe, it was still equivocal, and reliance on it in light of the notes in the file from Muller and Stoller that payment should not be made and the ramifications of wrongful payment is not evidence of good faith.

For the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.